IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **DANNY H. FLOYD, JR.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Case No. 14-cv-1352-CJP[1] |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner of Social** | ) |
| **Security,** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Danny Floyd, Jr. is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying his Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).

**Procedural History**

Plaintiff applied for DIB and SSI on August 3, 2011. In both applications, he alleged disability beginning on August 3, 2010. (Tr. 19). After holding two evidentiary hearings, Administrative Law Judge (ALJ) Christopher Hunt denied the application in a decision dated October 24, 2013. (Tr. 19-32). Plaintiff's request for review was denied by the Appeals Council, and the decision of the

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).  See, Doc. 9.

ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

### Issues Raised by Plaintiff

Plaintiff raises the following point:

1. The ALJ ignored mental RFC evaluations which were completed by agency reviewers and called for a greater degree of limitation than the ultimate RFC assessment.

### Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.**

If the answer at steps one and two is "yes," the claimant will

3

automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. **Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984). See also Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled.... If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See,** *Books v. Chater***, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater***, 55 F.3d 300, 306 (7th Cir. 1995)**).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).** In

4

reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. **Brewer v. Chater, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, **Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Hunt followed the five-step analytical framework described above. He determined that plaintiff had not been engaged in substantial gainful activity since the alleged onset date. He found that plaintiff had severe impairments of seizure disorder, status post surgeries of shoulders including right subacromial decompression and distal clavicle excision and left shoulder procedure for multidirectional instability and resection of labral tear, mood disorder, and anxiety. (Tr. 21). He further determined that plaintiff's impairments do not meet or equal a listed impairment. (Tr. 22).

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the light level, with physical and mental limitations. (Tr. 23). Based on the testimony of a vocational expert (VE), he determined plaintiff could not perform his past work, but could perform other jobs which exist in significant numbers in the national and local economy. (Tr. 19-32).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1. Agency Forms**

Plaintiff was born in 1978 and was thirty-two years old at his alleged onset date. (Tr. 235). He was insured for DIB through March 31, 2012.[3] (Tr. 291). Plaintiff was five feet ten inches tall and weighed one hundred and forty-three pounds. (Tr. 238). He completed two years of college and received a certification for fork lift operation. He previously worked at a lumber company, on a barge, and in a warehouse. (Tr. 239).

Plaintiff initially claimed a neck injury and epilepsy made him unable to work. (Tr. 238). He took Divalproex for his seizures, Hydrocodone for his neck injury, and Nabumetone for his arthritis in his neck and back. (Tr. 283, 287).

In September 2011 and February 2012, plaintiff submitted function reports. (Tr. 247-56, 276-84). He stated that he frequently had seizures that caused him to fall and break several of his bones. He could not be left alone or operate a vehicle. (Tr. 246, 276, 279). Most days he had difficulty getting out of bed and needed to be supervised while he ate so he would not choke. He had to sit to perform most routine tasks to prevent falling from seizures. (Tr. 247, 277).

Plaintiff was depressed because he had difficulty performing everyday tasks. (Tr. 247). He needed to be reminded to shave, shower, take his medicine, and have his medications refilled. He did not make any meals or perform any

---

[3] The date last insured is relevant to the claim for DIB, but not the claim for SSI. See, 42 U.S.C. §§ 423(c) & 1382(a).

housework. (Tr. 248, 278).

Plaintiff claimed to have problems lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, climbing stairs, remembering, completing tasks, concentrating, understanding, following instructions, using his hands, and getting along with others. He did not enjoy being around people because he was constantly afraid of having another seizure. He stated he could only pay attention for a few minutes without his head hurting and had difficulty following instructions as a result. (Tr. 251, 281).

### 2. Evidentiary Hearings

Plaintiff was represented by counsel at the first evidentiary hearing held on March 20, 2013. (Tr. 52-87). He lived with his girlfriend, his father, his four year old son, and his girlfriend's six year old daughter. (Tr. 64-65, 74-75).

Plaintiff testified that pain in his lower back, arms, neck, and legs, as well as seizures and depression made him unable to work. (Tr. 53-80). In 2000, plaintiff flipped his car due to a seizure and hurt his neck. He stated that he could not hold his head downward for extended periods as a result. (Tr. 67). He had a driver's license but he did not drive. His family members drove him because he was concerned he would have a seizure while driving. Plaintiff testified that he renewed his license and did not tell the DMV he had a seizure disorder. (Tr. 66).

Plaintiff stated he had seizures once or twice a week that lasted for thirty seconds to a minute and caused him to fall. (Tr. 70-71). It would take him anywhere from thirty minutes to several hours to recover from a seizure. (Tr.

72). His seizures happened at all times of the day and were not caused by anything in particular. (Tr. 72).

The ALJ noted that plaintiff's records indicated he had difficulty complying with doctor's orders to refrain from drinking alcohol as it interfered with his medications and resulted in seizures. (Tr. 56). Plaintiff testified that he drank once every two or three months but it made him sick. (Tr. 76). He stated that the year prior he smoked marijuana to help combat his seizures but it did not provide relief. (Tr. 76).

Plaintiff testified that a sharp shooting pain from his neck runs through his arms on a daily basis. (Tr. 68). The pain caused his right arm to go completely numb and he only experienced relief when he took medication four times a day. (Tr. 69). Plaintiff stated his back pain began in 2001 when he was hit by a drunk driver. He had difficulty sleeping and had trouble getting in and out of bed as a result. He could sit for thirty minutes before needing to get up for a few minutes to relieve his back pain. (Tr. 59). He was unable to lift his forty pound son and could only stand for fifteen minutes at a time. (Tr. 64-65).

Plaintiff also testified that his depression affected him every day. He stated that he contemplated suicide but his children kept him alive. (Tr. 73). Depression caused him to be lethargic and have a short temper. He stated that his medications caused him to get angry even more easily and made it difficult for him to listen. (Tr. 74).

The ALJ asked the vocational expert (VE) hypotheticals that were more restrictive than his ultimate RFC assessment, namely restricting the

hypothetical person to only occasional or superficial contact with the general public, supervisors, and co-workers. The VE testified that with occasional contact the person could perform two jobs that existed in the national and local economies. However, if the person was limited to superficial contact only one job, small parts assembler, would remain. (Tr. 80).

The ALJ then requested plaintiff obtain a physical consultative examination in order to make the record complete. (Tr. 82). After plaintiff obtained the consultative exam, he returned for his second hearing on October 1, 2013. (Tr. 40-49). No further testimony from plaintiff was taken and the ALJ had an additional vocational expert testify. (Tr. 42). The ALJ asked the vocational expert hypotheticals that comported with the final RFC determination, that is, a person of plaintiff's age and work history who was able to perform light work limited to only occasionally reaching overhead with both extremities and limited to frequent reaching in all other directions. Additionally, he should avoid exposure to unprotected heights and dangerous machinery and was limited to occasional use of lower extremities to operate foot controls. Finally, the person should be limited to simple, repetitive, routine work. (Tr. 43-45).

The VE testified that the person could not perform plaintiff's previous work. (Tr. 44). However, he could perform work that existed in significant numbers in the national and local economies. Examples of such jobs are router and information clerk. (Tr. 45). The VE also testified that if the individual was confrontational or argumentative with co-workers two to three times a week it would preclude all work. Additionally, work would be precluded if the

9

individual was off task for twenty percent of the workday. (Tr. 48).

### 3. Medical Treatment

Plaintiff's medical records are extensive but his complaint focuses solely on his mental illnesses and issues with concentration, persistence, and pace. As a result, this Court will focus on the portions of the record relating to these points.

Plaintiff's medical records indicate he had his first seizure in 2001 and did not have another until 2005. (Tr. 341). He stated that he abruptly stopped taking Xanax which caused the seizure in 2005 and another in 2007. He was given a prescription for Dilantin by his neurologist, Dr. Riaz Nasser, in January 2008. (Tr. 341).

In March 2011 plaintiff presented to Gateway Regional Medical Center Emergency Room after having three seizures witnessed by his mother and girlfriend. He had stopped taking Dilantin due to costs. (Tr. 332, 579). Plaintiff reported taking Xanax given to him by friends and thought he was having withdrawal seizures. (Tr. 579). The emergency room discharged him with Keppra to help control the seizures. (Tr. 332, 579-80). Later that month, plaintiff was arrested and detained for possession of a controlled substance and domestic battery. (Tr. 25, 551). While detained, plaintiff reported suicidal thoughts and was found lying on the floor of his cell. (Tr. 553, 568). He was taken to the hospital where he reported anxiety and chronic seizures. (Tr. 570).

In April 2011, plaintiff presented at Anderson Hospital after a one minute grand mal seizure was witnessed by family. (Tr. 387). He was not taking any

medications for his seizures and was scheduled to see Dr. Naseer in two days. (Tr. 387). Dr. Naseer started plaintiff on Depakote and scheduled a follow up appointment three months later. (Tr. 332-33). In July 2011, plaintiff presented at Anderson Hospital with another one minute seizure. (Tr. 381-83). He was discharged with instructions to follow up with Dr. Naseer. (Tr. 383).

Plaintiff's next records with Dr. Naseer are from November 2011. Dr. Naseer reported plaintiff had five complex partial seizures a year and no recent changes to his health. (Tr. 329-31). Plaintiff continued to see Dr. Naseer several times a year until the second hearing. (Tr. 498-500, 505-07, 971-74, 1122-25, 1127-30). Dr. Naseer usually stated plaintiff's seizures occurred five times a year and were controlled with medications. (Tr. 498, 500, 505, 971, 1122). He prescribed Levetiracetam and Topiramate and noted plaintiff had no significant side effects or memory loss. (Tr. 500, 505, 971, 11222, 1127). In September 2013, Dr. Naseer stated plaintiff's seizures were as frequent as three times per month but did not report any other significant changes. (Tr. 1127).

Plaintiff's records indicate his problems with mental illness began in August 2008. He reported hyperactivity that could not be controlled and was placed on Seroquel by Dr. Naseer. (Tr. 341). Plaintiff reported not reacting well to the Seroquel and a week later was started on Abilify to help control his mood. (Tr. 340).

In January 2011, plaintiff began seeing general practitioner Dr. Jim Hong, M.D. (Tr. 346-47). He reported having generalized anxiety and depression. (Tr. 346). He returned to Dr. Hong in August 2011 complaining of mild depression

11

but did not have suicidal thoughts. He was unable to tolerate Paxil and Dr. Hong started him on Celexa. (Tr. 362).

In September 2011, plaintiff reported anxiety and stated that Wellbutrin did not help his symptoms. He had stopped taking the medication and did not want to try any other SSRI. (Tr. 407, 967). Later that month, plaintiff presented at Gateway Regional Medical Center with anxiety and depression. He had a low suicide risk but was kept for inpatient treatment due to paranoia, delusions, angry outbursts, visual hallucinations, and mood swings. (Tr. 451). He attempted to fight with a security guard and tested positive for amphetamines and opiates. (Tr. 445, 453). He was diagnosed with a Depakote overdose, substance abuse, and psychosis, NOS. (Tr. 457).

In October 2012, plaintiff returned to Gateway Regional Medical Center for an overdose on Depakote and Xanax. (Tr. 789-803). Plaintiff stated the overdose was an accident but his family suggested he had an argument with his girlfriend that precipitated taking the pills. (Tr. 791). He was "very violent" in the emergency room and was admitted for crisis intervention and intensive psychotherapy in a group and individual basis. (Tr. 789). Plaintiff was placed in four-point restraints and was critically ill as a result of taking the medications. (Tr. 801). His discharge diagnoses were substance abuse psychosis and mixed personality disorder. (Tr. 789). In September 2013, Dr. Naseer indicated for the first time that plaintiff had bipolar disorder. (Tr. 1127).

### 4. RFC Assessments

State agency psychologist M.W. DiFonso assessed plaintiff's mental RFC in

October 2011. (Tr. 493-95). She reviewed plaintiff's medical records but did not examine plaintiff. She opined that plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, and accept instructions and respond appropriately to criticism from supervisors. (Tr. 493-94).

State agency physician Lenore Gonzalez, M.D., assessed plaintiff's physical RFC in September 2013. (Tr. 459-66). She also reviewed plaintiff's medical records but did not examine plaintiff. She felt plaintiff had no exertional limitations but should never climb ladders, ropes, or scaffolds. (Tr. 460-61). Additionally, plaintiff should avoid even moderate exposure to hazards such as machinery and heights. (Tr. 463).

### 5. Consultative Examinations

In April, 2013 plaintiff had a consultative examination performed by state agency internist, Dr. Raymond Leung. (Tr. 976-79). Plaintiff was taking hydrocodone, divalproex, and levetiracetam at the time of the consultation. Plaintiff's speech and hearing were within normal limits and he was alert and oriented. (Tr. 977). Dr. Leung's diagnostic impressions were seizures and a history of neck fracture. (Tr. 978).

## Analysis

The Court first notes that plaintiff only presents one primary issue in his complaint. As a result, any other arguments may be deemed waived as it is not this Court's duty to make legal arguments for the parties involved. ***Nelson v.***

***Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).** However, while plaintiff only raises one point it is dispositive and requires remand.

Plaintiff primarily argues that the while the ALJ gave great weight to Dr. DiFonso's opinion, he failed to incorporate plaintiff's limitations in concentration, persistence, and pace. The Commissioner argues that the ALJ considered the opinion of Dr. DiFonso and gave it appropriate consideration within his opinion. The Commissioner would be correct, had the ALJ not stated he felt plaintiff had moderate limitations in concentration, persistence, and pace in part three of his analysis. (Tr. 22). ALJ Hunt contradicts himself by both incorporating Dr. DiFonso's opinions and then discounting them later in his opinion. (Tr. 22, 30). Neither plaintiff nor the Commissioner note that the ALJ assigned plaintiff moderate limitations in concentration, persistence, and pace which is the sole reason for remand.

In assessing whether plaintiff's mental impairments met or equaled a listing, ALJ Hunt found that he had moderate difficulties in concentration, persistence, or pace. (Tr. 22). This is one of the "B criteria," which are relevant to the enquiry at step 3 of the sequential analysis. He found that plaintiff did not meet or equal a listing, but said that his RFC assessment "reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." (Tr. 23).

In a series of recent cases, the Seventh Circuit has reversed and remanded where an ALJ found that plaintiff had deficiencies of concentration, persistence or pace, but failed to include that limitation in the hypothetical

question posed to the VE. Plaintiff correctly, albeit peripherally, cites the opinion in ***O'Connor-Spinner v. Astrue*** where the Court emphasized that "for most cases, the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." ***O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620-21 (7th Cir. 2010).**

The situation in that case is remarkably similar to the situation presented here. Ms. O'Connor-Spinner suffered from depression and a state agency psychologist concluded that she had moderate limitation of concentration, persistence and pace. The ALJ agreed. The ALJ asked the vocational expert a series of hypothetical questions. The most restrictive hypothetical question restricted the person to routine, repetitive tasks with simple instruction, but did not include a limitation on concentration, persistence and pace. The Seventh Circuit held that the ALJ's decision was not supported by substantial evidence because the vocational expert was not asked to assume a limitation on concentration, persistence and pace. While the Court stated that there is no per se requirement that the phrase "concentration, persistence and pace" be used in the hypothetical, it went on to hold that the restriction to simple, repetitive tasks is not an adequate substitute because it "will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace." ***O'Connor-Spinner, Ibid.***

Neither party cites the most recent applicable Seventh Circuit case, **Yurt v. Colvin**, 758 F.3d 850 (7th Cir. 2014). In **Yurt**, the Court stated "[W]e have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." **Yurt, 758 F.3d at 859.** Under **Yurt** and **O'Connor-Spinner,** if a claimant has limitations in maintaining concentration, persistence and pace, those limitations must be spelled out in the RFC assessment and in the hypothetical question posed to the VE. ALJ Hunt seemed to acknowledge this in the elaborate hypotheticals he presented to the first VE at the original hearing. There, he limited plaintiff to simple, repetitive, routine tasks and no more than either occasional or superficial contact with the general public, supervisors, and co-workers. (Tr. 78-80). However, at the second hearing, where the VE was not privy to the testimony of plaintiff from the first hearing, his hypotheticals were much simpler and only contained the language ALJ Hunt used in his ultimate RFC. (Tr. 43-45). This is error.

The ALJ is "required to build a logical bridge from the evidence to his conclusions." **Simila v. Astrue, 573 F.3d 503, 516 (7th Cir. 2009).** ALJ Hunt simply failed to do so here. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." **Kastner v. Astrue, 697 F.3d 642, 646 (7th Cir. 2012)., citing Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002).**

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Danny Floyd's application for social security disability benefits is REVERSED and REMANDED to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

**IT IS SO ORDRED.**

**DATE: October 2, 2015.**

**s/ Clifford J. Proud**

**CLIFFORD J. PROUD**

**UNITED STATES MAGISTRATE JUDGE**
